UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KIMBERLEE A. FRAREY,

                         Plaintiff,

     -vs-                                   _____-cv-_____

ANTHONY L. JORDAN
HEALTH CORPORATION,

                         Defendant.
_____

# COMPLAINT

Plaintiff Kimberlee A. Frarey, by and through her attorneys, upon personal knowledge as to herself and upon information and belief as to other matters, brings this complaint against defendant Anthony L. Jordan Health Corporation, and alleges as follows:

## PRELIMINARY STATEMENT

1.     This is a civil action by Kimberlee A. Frarey ("Ms. Frarey") against defendant Anthony L. Jordan Health Corporation ("Jordan Health") under the anti-retaliation provisions of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.* and the New York False Claims Act, N.Y. State Finance Law § 187 *et seq.*

2.     As alleged in this complaint, Jordan Health unlawfully harassed, threatened, demoted, disciplined, and ultimately terminated Ms. Frarey in retaliation for her investigation into and reporting of a potential fraud against the U.S. Department of Health and Human Services and the State of New York, orchestrated by Jordan Health's senior management, and for her continued investigation into a potential cover-up of that activity.

# JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over the claims alleged in this complaint pursuant to 28 U.S.C. § 1331 as this matter involves federal questions because this case is brought under the False Claims Act, 31 U.S.C. § 3730(h).

4.      This Court has supplemental jurisdiction over the New York state law claims under 28 U.S.C. § 1367(a), as they are so related in this action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5.      Venue is proper in the Western District of New York under 28 U.S.C. § 1391(b) because Jordan Health resides and transacts business, and because a substantial part of the events or omissions on which the claims are based, occurred in this District.

# PARTIES

## *Plaintiff Kim Frarey*

6.      Ms. Frarey is a resident of Rochester, New York.

7.      In or about May 2008, Jordan Health hired Ms. Frarey as its Chief Operating Officer ("COO"), and, in or about September 2009, Ms. Frarey moved from the position of COO to the position of Chief Compliance Officer ("CCO").

8.      Throughout her employment with Jordan Health, Ms. Frarey was qualified for the jobs she held and consistently received excellent performance reviews.

9.      At all relevant times, Ms. Frarey was an "employee, contractor, or agent" of Jordan Health within the meaning of the False Claims Act, 31 U.S.C. § 3730(h).

*Defendant Jordan Health*

10.     All actions and omissions described in this complaint were made by Jordan Health directly and/or through its supervisory employees and agents.

11.     Upon information and belief, Jordan Health is a not-for-profit corporation organized under the laws of the State of New York and has its principal place of business at 82 Holland Street, Rochester, New York 14605.

12.     Upon information and belief, Jordan Health is and was a federally qualified health center ("FQHC") funded by the federal government and the State of New York.

13.     Upon information and belief, as a FQHC, Jordan Health receives federal and state funding to provide primary health care and related services to unserved and underserved populations in health professional shortage areas.

14.     Upon information and belief, in or about December 2012, Janice Harbin ("Harbin") became the President/CEO of Jordan Health and served in that role throughout the relevant events described herein.

15.     Upon information and belief, in or about late 2013, Jason Dunn ("Dunn") became the COO of Jordan Health and served in that role throughout the relevant events described herein.

16.     Upon information and belief, Shelley Knapp ("Knapp") was Jordan Health's Senior Director of Human Resources and Talent Management and served in that role throughout the relevant events described herein.

17.     This Court has personal jurisdiction over Jordan Health pursuant to 31 U.S.C. § 3732(a) because Jordan Health can be found, resides, and transacts business in the Western District of New York.

# FACTUAL ALLEGATIONS

I.   *Ms. Frarey obtained information concerning a potential fraud on the government.*

18.     On or about July 16, 2015, Ms. Frarey obtained information from a Jordan Health employee (the "reporting employee") that a member of Jordan Health's senior management, Dunn, had improperly authorized payment of approximately $10,000 to another member of Jordan Health's senior management, Knapp, through a scheme in violation of Jordan Health's payment and benefit policies (hereinafter, "the Misappropriation Scheme").

19.     The reporting employee also told Ms. Frarey that Dunn and Knapp had an inappropriate relationship that was causing dysfunction within the Human Resources department.

20.     Ms. Frarey instructed the reporting employee to speak directly with President/CEO Harbin regarding the issues to allow Harbin to have an opportunity to address the issues, including because Dunn reported directly to Harbin, and Knapp reported directly to Dunn.

II.   *Ms. Frarey engaged in protected activity; and Jordan Health had notice that Ms. Frarey was investigating the Misappropriation Scheme.*

A.     Ms. Frarey initiated an investigation into the Misappropriation Scheme.

21.     Following her instructions to the reporting employee, and concerned that the Misappropriation Scheme may have violated the False Claims Act, Ms. Frarey initiated her own investigation into the Misappropriation Scheme, directed at exposing a fraud on the government.

22.     On or about July 17, 2015, Ms. Frarey pulled payroll records and met with a Jordan Health payroll clerk.

23.     Ms. Frarey determined that Dunn had improperly directed the payment of thousands of dollars to Knapp to which Knapp was not entitled; that Knapp had received those monies through payroll deposit into her personal checking account; and that Knapp had knowingly retained those monies.

24.     After Ms. Frarey confirmed the Misappropriation Scheme, the reporting employee informed Ms. Frarey that Harbin had told the reporting employee that she did not care about the money Dunn had improperly directed to Knapp and that she did not have a problem with the conduct, among other things.

25.     By investigating the Misappropriation Scheme, Ms. Frarey engaged in protected activity.

### B.     Ms. Frarey had an initial meeting with Harbin regarding the Misappropriation Scheme.

26.     Shortly thereafter, Ms. Frarey met with Harbin and informed her, among other things, that Ms. Frarey's investigation corroborated the Misappropriation Scheme and told Harbin that it was a grave problem for senior leadership to misappropriate money provided to Jordan Health by the government for the purpose of carrying out Jordan Health's mission of providing healthcare to the poor and vulnerable.

27.     Ms. Frarey also informed Harbin that Ms. Frarey's investigation was underway and that the matter needed to be reported to the Board.

28.     By investigating and reporting the Misappropriation Scheme to Harbin, Jordan Health's President/CEO, Ms. Frarey engaged in activity protected by the False Claims Acts and also made Jordan Health aware that she was investigating the potential

that certain members of Jordan Health's senior management had committed a fraud on the government.

### C.    Ms. Frarey informed members of Jordan Health's Board of the Misappropriation Scheme.

29.    Around the same time, Ms. Frarey also reported the Misappropriation Scheme to Cynthia Herriott ("Herriott"), Chair of the Board Compliance Committee, and Gaynelle Wethers ("Wethers"), Board Chair and member of the Board Compliance Committee, who directed that Ms. Frarey formally report the matter at the July Board Compliance Committee meeting (the "July Compliance Meeting") and, then, to the full Board at the regular July Board meeting scheduled for July 28, 2015 (the "July 28 Board Meeting").

30.    Ms. Frarey reported on the existence and nature of the Misappropriation Scheme at the July Compliance Meeting.

31.    Ms. Frarey thereafter attended the July 28 Board Meeting along with Jonathan Clune ("Clune"), who at all relevant times was Jordan Health's Chief Financial Officer ("CFO").

32.    At the July 28 Board Meeting, Ms. Frarey reported to the full Board on the existence and nature of the Misappropriation Scheme, and informed the Board that her investigation into the Misappropriation Scheme was underway.

33.    During that meeting, Harbin repeatedly interrupted Ms. Frarey and objected to Ms. Frarey's reporting on the relationship between Dunn and Knapp; and Harbin told the Board that Dunn is "very important to Jordan."

34.    On July 30, 2015, Clune sent an email to the Board describing the Misappropriation Scheme as "larceny."

35.     At or about the same time, Clune told Ms. Frarey that Harbin was more concerned that Ms. Frarey had reported the issue than the fact that Knapp and Dunn had misappropriated the money from Jordan Health.

36.     A special Board meeting was set for August 6, 2015, for the purpose of updating the Board on Ms. Frarey's investigation into the Misappropriation Scheme (the "August 6 Board Meeting").

37.     At the August 6 Board Meeting, Ms. Frarey reported on the Misappropriation Scheme and addressed risks relating to the misappropriation of government funds intended for providing healthcare to Jordan Health's patients, and confirmed that the Misappropriation Scheme could constitute a fraud on the government, among other things.

38.     At the August 6 Board Meeting, Ms. Frarey's report recommended discipline of Dunn and Knapp, up to and including termination, and restitution, if legally possible; however, Jordan Health's attorney stated that he did not think that Ms. Frarey, Jordan Health's CCO, should have any involvement in the matter or make disciplinary recommendations concerning Dunn and Knapp.

39.     Discussion at the August 6 Board Meeting focused on the termination of Dunn and Knapp and the possibility of criminal remedies, as well as restitution if legally possible; Harbin vehemently objected to the termination of Dunn and Knapp, and to the possibility of criminal remedies.

40.     During the August 6 Board Meeting, Harbin refused to terminate Dunn, however, telling the Board, "if you don't like my decision, you can take it up in my performance evaluation." In response, Board members told Harbin that the Board would accept nothing less than final written warnings for Dunn and Knapp.

41.     At the end of the August 6 Board Meeting, the Board directed Harbin to work with Jordan Health's attorney to craft final written warnings to Dunn and Knapp, to determine if restitution was legal and, if so, to effectuate the restitution, thereby decreasing Ms. Frarey's responsibilities despite the Misappropriation Scheme being a compliance issue within the scope of her job responsibilities.

42.     Upon information and belief, Harbin did not give final written warnings to Dunn and Knapp as instructed by the Board.

43.     In fact, shortly after the August 6 Board Meeting, Ms. Frarey obtained information that Harbin had failed to determine if restitution was legal and had failed to effectuate the restitution.

44.     In light of that information, and despite Jordan Health having removed Ms. Frarey from the resolution and discipline aspects of the investigation into the Misappropriation Scheme that she had initiated, Ms. Frarey was concerned that a potential fraud on the government had not been adequately rectified.

45.     Accordingly, Ms. Frarey continued to investigate the resolution/restitution aspect of the Misappropriation Scheme, even though she was not directly involved in determining either its feasibility or implementation.

46.     Ms. Frarey did this throughout August, September, and early November 2015 through email and personal conversations with Clune, and through telephone and personal conversations with Harbin.

47.     By reporting the Misappropriation Scheme to members of the Board, the Board Compliance Committee and then to the Board as a whole, Ms. Frarey engaged in protected activity and, further, made Jordan Health aware that she was investigating the

potential that certain members of Jordan Health's senior management had committed a fraud on the government.

48.    By continuing to investigate resolution of the Misappropriation Scheme after her responsibilities had been decreased, Ms. Frarey engaged in protected activity and, further, made Jordan Health aware that she was investigating the potential that certain members of Jordan Health's senior management had committed a fraud on the government.

III.    *Jordan Health, primarily through its President/CEO Harbin, began a pattern of retaliation against Ms. Frarey in light of her investigation into and reporting on the Misappropriation Scheme; and an independent investigation by special counsel confirmed the retaliation against Ms. Frarey.*

49.    Immediately following the initiation of Ms. Frarey's investigation into, and reporting on, the Misappropriation Scheme, Jordan Health, including through its President/CEO Harbin, embarked on a campaign of retaliation against Ms. Frarey because of her engagement in protected activity. This retaliation included but was not limited to the following conduct.

50.    In a meeting between Ms. Frarey and Harbin following the July 28 Board Meeting, Harbin was dismissive, angry, and curt with Ms. Frarey when discussing the Misappropriation Scheme.

51.    On or about August 5, 2015, Jordan Health's attorney refused to provide advice to Ms. Frarey regarding whether restitution was legally possible so that she could present an informed answer in her report to the Board at the August 6 Board Meeting.

52.     Before the August 6 Board Meeting and following a meeting between Clune and Harbin, Clune told Ms. Frarey that "Harbin isn't focusing on Dunn, but she is blaming you for all of this."

53.     At the August 6 Board Meeting, Harbin interrupted, was derisive, and attempted to disrupt Ms. Frarey's presentation of the Misappropriation Scheme to the Board, which prompted Board members repeatedly to ask Ms. Frarey to repeat what she had been trying to say.

54.     At the August 6 Board Meeting, Jordan Health's Board decreased Ms. Frarey's responsibilities despite that the Misappropriation Matter was a compliance issue within the scope of her job responsibilities.

55.     On the morning of August 25, 2015, preceding the regular Board meeting held later that evening, Harbin berated and screamed at Ms. Frarey on a telephone call, and blamed Ms. Frarey for the decision to exclude Dunn and Knapp from the August 25 Board meeting, a decision of which Ms. Frarey had no involvement or knowledge.

56.     At a senior leadership meeting on September 8, 2015, Harbin, while looking at Ms. Frarey, said: "I have no problem with immediate termination of any one of you who is not undividedly loyal to me."

57.     From the end of August 2015 through remainder of the year, Harbin demeaned, humiliated, and undermined Ms. Frarey during pre-scheduled, one-on-one meetings, as well as during other meetings.

58.     At a meeting between Harbin, Knapp, and Ms. Frarey on October 15, 2015 (the "October 15 Meeting"), Harbin berated, bullied, and yelled at Ms. Frarey for taking an employee's compliance complaint, including telling Ms. Frarey that talking with the

employee was "completely inappropriate," despite Ms. Frarey's job responsibilities as CCO.

59.     After the October 15 Meeting, a Jordan Health employee told Ms. Frarey that she left her desk because she could not stand Harbin yelling at Ms. Frarey during the October 15 Meeting.

60.     On November 4, 2015, Ms. Frarey attended a meeting with Harbin and Clune ("November 4 Meeting"), during which Harbin continued to harass and berate Ms. Frarey.

61.     At the end of the November 4 Meeting, Ms. Frarey informed Harbin that she considered the meeting to be a continuation of the abusive, retaliatory conduct that Harbin had exhibited toward Ms. Frarey following Ms. Frarey's investigation and reporting of the Misappropriation Scheme; Harbin responded by pointing at Ms. Frarey and stating: "you're done."

62.     Upon information and belief, as of the November 4 Meeting, Harbin still had not resolved the Misappropriation Scheme.

63.     In the days following the November 4 Meeting, Knapp—who was one of the participants in the Misappropriation Scheme and a subject of Ms. Frarey's investigation—was directed to get a written statement from Ms. Frarey as part of an investigation into Ms. Frarey's having raised the issue of retaliation during the November 4 Meeting.

64.     At a one-on-one meeting between Harbin and Ms. Frarey on December 3, 2015, Harbin began the meeting with a threatening and crude story involving inappropriate language.

65.    The following day, December 4, 2015, Ms. Frarey was called to Harbin's office and presented with a Final Written Warning.

## IV.   *An independent investigation by special counsel confirmed Jordan Health's retaliation against Ms. Frarey even as Jordan Health continued to retaliate.*

66.    On December 4, 2015, Herriott and Wethers, whom Ms. Frarey had kept informed of the retaliatory conduct, directed Ms. Frarey to write up a formal complaint of retaliation detailing the retaliatory acts since Ms. Frarey became involved in responding to the Misappropriation Scheme.

67.    Ms. Frarey provided Herriott with a formal written complaint of retaliation on December 14, 2015 (the "Retaliation Complaint"), about which Herriott apprised the Board and Harbin.

68.    Upon information and belief, Herriott then secured Board authorization for investigation of the Retaliation Complaint by independent special investigative counsel, the law firm of Littler Mendelson, and, additionally reopened the investigation into the Misappropriation Scheme, which Littler Mendelson also investigated (together, the "Independent Investigation").

69.    On or about January 11, 2016, Ms. Frarey attended an investigative interview at Littler Mendelson concerning the Independent Investigation.

70.    The following day, on or about January 12, 2016, Harbin stormed into Ms. Frarey's office and berated Ms. Frarey for asking human resources for materials to provide to the investigator.

71.     Harbin also harassed and interrogated Ms. Frarey concerning her attendance at the investigative interview and about the details of communications and work done by Ms. Frarey on the day of the investigative interview.

72.     On or about February 5, 2016, Ms. Frarey was called into Harbin's office where Knapp and Harbin were waiting.

73.     Harbin then told Ms. Frarey: "I am immediately placing you on paid administrative leave while Shelly[Knapp] investigates whether you are disrupting operations" ("Knapp's Pretextual Investigation").

74.     On or about February 9, 2016, Herriott called Ms. Frarey and told Ms. Frarey about the results of the Independent Investigation as reported to the Board by Littler Mendelson at a Board meeting held on or about February 9, 2016.

75.     Specifically, Herriott told Ms. Frarey that the Independent Investigation determined that (i) Harbin had engaged in a retaliatory course of conduct against Ms. Frarey; (ii) the allegations of retaliation made by Ms. Frarey in her Retaliation Complaint were found to be true, with supporting evidence cited to the Board; and (iii) a second Board meeting (the "Follow-Up Board Meeting") was to be scheduled so that Littler Mendelson could provide advice regarding the proper response to the findings of the Independent Investigation.

76.     Herriott also told Ms. Frarey that the results of Ms. Frarey's investigation into the Misappropriation Scheme were upheld, and that Special Counsel was especially damning of Knapp and Dunn's conduct.

77.     Herriott also told Ms. Frarey that Littler Mendelson had advised the Board that terminating Ms. Frarey would prove her claim of retaliation.

78.    The Board also shared the information from Littler Mendelson with Harbin.

79.    On February 22, 2016, Ms. Frarey provided a written response to Knapp's Pretextual Investigation, ending her response by stating: "I consider both your 'Investigation' and my being placed on 'administrative leave' are only further evidence in a pattern of pretextual, retaliatory abuse for doing my job as the Chief Compliance officer of the Anthony L. Jordan Health Corporation."

80.    In that response, Ms. Frarey also objected to Knapp's characterization of the Misappropriation Scheme as a "purported compliance issue" with the following statement: "As regards the matter being a 'purported' compliance issue, the board minutes and resolution make it abundantly clear that the matter was an actual compliance issue, as does the restitution made by you to the corporation. Additionally, the matter involved approximately $8,000.00 plus related employer funded payroll contributions, etc., being improperly deposited into your checking account or otherwise accrued to your benefit, to all of which you had no entitlement and all of which was paid for by an organization funded with government monies."

81.    Upon information and belief, despite the results of the Independent Investigation and Littler Mendelson's advice to the Board that terminating Ms. Frarey would further prove the retaliation against her, Littler Mendelson was not allowed to attend and present at the Follow-up Board Meeting.

82.    Rather, at the Follow-Up Board Meeting on or about March 22, 2016, the Jordan Health Board continued the retaliation against Ms. Frarey by voting to recommend termination of Ms. Frarey's employment on the basis that Harbin would

have to work in a "toxic" relationship with someone who had filed a retaliation complaint against her if Ms. Frarey was not terminated.

83.     On March 23, 2016, Harbin sent a letter to Ms. Frarey informing her that her employment with Jordan Health was terminated as of that day.

# CLAIMS

## FIRST CLAIM—FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3730(H)

84.     Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 - 83, as if fully set forth herein.

85.     Plaintiff brings this claim pursuant to the anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h).

86.     By the above actions, defendant has violated the False Claims Act, 31 U.S.C. § 3730(h), including through, but not limited to, the following conduct:

   a.     retaliating against plaintiff in the terms and conditions of her employment, including by harassing, demeaning, threatening, and verbally abusing plaintiff;

   b.     creating a hostile work environment;

   c.     decreasing plaintiff's responsibilities;

   d.     issuing a final written warning to plaintiff;

   e.     placing plaintiff on administrative leave;

   f.     dismissing the results of the Independent Investigation; and

   g.     terminating plaintiff from her employment with defendant.

87.     Plaintiff engaged in activities protected under the False Claims Act, including by investigating and reporting on the Misappropriation Scheme, which was directed at exposing a fraud on the government.

88.     Defendant was fully aware that plaintiff was engaging in activities protected under the False Claims Act.

89.     Defendant retaliated against plaintiff because plaintiff was engaging in activities protected under the False Claims Act.

90.     Plaintiff is entitled to relief under 31 U.S.C. § 3730(h), to wit, reinstatement with the same seniority status that plaintiff would have had but for the retaliation; two (2) times the amount of back pay, interest on the back pay; and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

### SECOND CLAIM—N.Y. FALSE CLAIMS ACT, N.Y. FIN. LAW § 191(1).

91.     Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 - 90, as if fully set forth herein.

92.     Plaintiff brings this claim pursuant to the anti-retaliation provisions of the N.Y. False Claims Act, N.Y. State Finance Law § 191(1).

93.     By the above actions, defendant has violated the N.Y. False Claims Act, N.Y. State Finance Law § 191(1), including through, but not limited to, the following conduct:

a.     retaliating against plaintiff in the terms and conditions of her employment, including by harassing, demeaning, threatening, and verbally abusing plaintiff;

b.     creating a hostile work environment;

     c.      decreasing plaintiff's responsibilities;

     d.      issuing a final written warning to plaintiff;

     e.      placing plaintiff on administrative leave;

     f.      dismissing the results of the Independent Investigation; and

     g.      terminating plaintiff from her employment with defendant.

94.     Plaintiff engaged in activities protected under the N.Y. False Claims Act, including by investigating and reporting on the Misappropriation Scheme, which was directed at exposing a fraud on the government.

95.     Defendant was fully aware that plaintiff was engaging in activities protected under the N.Y. False Claims Act.

96.     Defendant retaliated against plaintiff because plaintiff was engaging in activities protected under the N.Y. False Claims Act.

97.     Plaintiff is entitled to relief under the N.Y. False Claims Act, N.Y. State Finance Law § 191(1), to wit, reinstatement with the same seniority status that plaintiff would have had but for the retaliation; two (2) times the amount of back pay, interest on the back pay; and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## JURY DEMAND

98.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury of the above-captioned action.

# DEMAND FOR RELIEF

**WHEREFORE,** Ms. Frarey demands judgment against Jordan Health as follows:

A)    On her first claim, damages including, but not necessarily limited to, two times the amount of back pay, interest on back pay, compensatory damages (including front pay), and all reasonable expenses that were necessarily incurred in the prosecution of this action, plus all reasonable attorneys fees and costs, as provided in False Claims Act, 31 U.S.C. § 3730(h);

B)    On her second claim, damages including, but not necessarily limited to, two times the amount of back pay, interest on back pay, compensatory damages (including front pay), and all reasonable expenses that were necessarily incurred in the prosecution of this action, plus all reasonable attorneys fees and costs, as provided in N.Y. False Claims Act, N.Y. State Finance Law § 191(1); and

C)    Awarding plaintiff the costs and disbursements of this action.


Dated:  March 14, 2018
           Rochester, NY

s/Michael Rothenberg

Michael Rothenberg, Esq.
David Rothenberg, Esq.
*Attorneys for Plaintiff*
ROTHENBERG LAW
45 Exchange Boulevard, Suite 800
Rochester, New York 14614
Tel:  (585) 232-1946
Fax:  (585) 232-4746
Email:  michael@rothenberglawyers.com
Email:  david@rothenberglawyers.com